The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner with some modifications. Defendants here have requested the Full Commission receive further evidence in the way of an affidavit by Walter Cooper concerning further information on the ultimate disposition of the position offered plaintiff. In the discretion of the undersigned, pursuant to Rule 701 of the Workers' Compensation Rules and N.C.G.S. § 97-85, the Affidavit shall be ADMITTED into the record for consideration by the undersigned. The Full Commission, in their discretion, have further determined that there are no good grounds in this case to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
* * * * * * * * * * *
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties at the hearing as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the plaintiff and defendant C T Refineries as of May 4, 1993.
3. On May 4, 1993, Liberty Mutual was the carrier on the risk for defendant C T Refineries.
4. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with the defendant employer on May 4, 1993.
5. As acknowledged by the Form 21, approved by the Commission on August 3, 1993, at the time of plaintiff's injury by accident, his average weekly wage was $486, yielding a compensation rate of $324.02.
* * * * * * * * * * *
Based upon the competent, credible, and convincing evidence of record, the Full Commission make the following additional
FINDINGS OF FACT
1. Prior to his accident of May 4, 1993, plaintiff had an previous compensable injury by accident on or about April, 1991. Plaintiff came under the care of Dr. Todd Chapman, who eventually performed a laser disc decompression at L4-5, on or about September 11, 1992. Following the surgery, plaintiff underwent a functional capacity evaluation on November 2, 1992, which showed that he was capable of work in the light to medium range.
2. On November 4, 1992, Dr. Todd Chapman released plaintiff to return to work in light to medium duty per the functional capacity evaluation. He found plaintiff had reached maximum medical improvement with a ten percent permanent partial impairment of his back.
3. Plaintiff's second injury by accident on May 4, 1993, which is the subject of this claim, occurred while plaintiff was working for defendant as a hydrogenation plant operator. His job duties required him to lift 50 pound bags of filtering material 2 to 4 times per shift and to carry these bags about 20 feet. He was also required to lift buckets of catalyst weighing up to 30 pounds and to carry them about 8 feet, as often as 7 to 8 times per shift. Plaintiff's job also required that he climb a flight of about 10 stairs to get to the second level of tanks.
4. On May 4, 1993, plaintiff again injured his back. Following the accident on May 4, 1993, plaintiff had a myelogram on June 30, 1993, which showed mild disc bulges at L4-5, a disc bulge at L5-S1 with a small component of central herniation, and no evidence of nerve root compression. He also had a CT scan done.
5. Dr. Frederick E. Finger at Charlotte Neurosurgical reviewed the results of the myelogram and the CT and saw plaintiff on July 12, 1993. He released plaintiff to return to work on July 19, 1993, with the restriction that he should limit his lifting, bending, and stooping to avoid becoming symptomatic.
6. A job description for the position of hydrogenation plant operator was prepared for Dr. Chapman to review. After reviewing the job description, Dr. Chapman stated in a letter of August 27, 1993 that plaintiff "can and should work" based upon the functional capacity evaluation done November 2, 1992. However, Dr. Chapman also noted that plaintiff would need assistance with the lifting of 50 pound bags of filtering material that was required 2 to 4 times per shift.
7. As of July 19, 1993, plaintiff was capable of light to medium work. However, as shown by Dr. Chapman's assessment, plaintiff could not have performed his normal position as hydrogenation plant operator without some assistance. The employer had no other positions available which complied with plaintiff's restrictions at that time, and so plaintiff was continued on temporary total disability benefits.
8. On September 23, 1993, plaintiff met with Walter Cooper, Vice President and General Manager of C T Refineries and Larry Fleet, safety manager. They discussed plaintiff's situation and concluded that there were still no positions available for plaintiff, and continued him on temporary total disability compensation.
9. Another functional capacity evaluation was done on November 2, 1993, which showed that plaintiff could perform medium category work. He could lift up to 50 pounds infrequently and 25 pounds or less frequently. Plaintiff was cooperative and appeared to put forth his maximum effort during the test. Although he complained of pain before and after the test, the examiner saw little or no pain behavior during the test.
10. Plaintiff continued to receive temporary total disability benefits up into February, 1994, without controversy since defendant-employer still had no positions appropriate for plaintiff's restrictions. No positions were offered to plaintiff, and plaintiff did not seek employment elsewhere that would be consistent with his restrictions.
11. In February, 1994, plaintiff moved to Floral City, Florida. His wife's family lived in the area. Plaintiff's wife had health problems, and they needed the assistance of her family with child care. Although he was still receiving temporary total disability compensation, plaintiff did not notify defendant-employer that he had moved to Florida. Walter Cooper learned that plaintiff had moved to Florida when he tried to contact him that month.
12. After learning that plaintiff had moved to Florida, on March 30, 1994, Walter Cooper sent plaintiff a letter offering him a position as Filling Packaging Clerk. The duties included taking a daily inventory of all products in the warehouse, handling incoming orders, and transferring paperwork from the main office to the manufacturing plant, using the company pickup truck to pick up hardware supplies and mail twice a day, and ordering raw materials. Frequent lifting would not exceed 20 pounds and occasional lifting would not exceed 40 pounds. The starting pay would be $8.50 per hour. According to Walter Cooper, this job did not exist previously but had evolved due to the growth of the warehouse.
13. The job duties to be performed by the Filling and Packaging Clerk are all duties that are necessary and are carried out. However, these duties have been split between and continued to be performed through the date of initial hearing by three other employees: the production manager, the safety director, and the shipping department.
14. In his letter of March 30, 1994, Walter Cooper stated "We will hold this position for you until 4-4-94." Although plaintiff did not take the position, it had not been filled at the time of the initial hearing, almost 9 months later. The position had never been advertised either internally or to the general public. Other positions had evolved as the warehouse grew and those positions had been filled. Although the employer has a union contract that requires job descriptions, the job description for the Filling and Packaging Clerk had not been listed with the union.
15. Under all these circumstances, the job offered to plaintiff was not a legitimate job that was otherwise available to the general public. This job was "make-work" which was specifically created in an effort to get plaintiff back to work, or otherwise cut off his benefits. The fact that the position was ultimately filled by the employer after the initial hearing is neither credible nor convincing to the undersigned on this issue.
16. After moving to Florida in February, plaintiff did not return to North Carolina to accept the position offered by Walter Cooper. Plaintiff did not start looking for a job in Florida until April 11, 1994, after he had received the letter of March 30 from Walter Cooper, offering him the position of Filling Packaging Clerk.
17. The defendant filed a Form 24 application to Stop Payment of Compensation which was denied by the Commission on April 21, 1994. A second Form 24 was denied on June 7, 1994. A third Form 24 was approved July 7, 1994, at which time defendants stopped payments of temporary total disability benefits.
18. On August 8, 1994, plaintiff was seen by Dr. Gelin at Citrus Memorial Hospital in Florida. Plaintiff was continuing to complain of back pain radiating down both legs. Dr. Gelin referred him to Dr. Kaplan for a neurosurgical evaluation.
19. An MRI was done on August 12, which Dr. Kaplan reviewed. He also gave plaintiff a physical exam. The physical exam and neurological testing were normal. The MRI showed no sign of recurrent disc herniation. Dr. Kaplan did not believe surgery was appropriate and recommended pain clinic injections or physical therapy, both of which plaintiff declined.
20. On August 26, 1994, plaintiff had an independent medical evaluation with Dr. John Shim of the Matthews Orthopaedic Clinic in Florida. Dr. Shim concluded that plaintiff had reached maximum medical improvement as of his last visit with Dr. Finger on July 17, 1993. It was Dr. Shim's opinion that plaintiff had a five percent whole body impairment under the AMA Guides and that he should have a job with lifting restrictions of 20-25 pounds.
21. Plaintiff continued to look for a job in Florida. Around October 7, 1994, he began working at a car wash 40 hours per week, earning $5 per hour. He was continuing to work in this job at the time of initial hearing.
22. The only convincing evidence of plaintiff's actual wage earning capacity is the evidence that he looked for a job and eventually got one earning less than he earned while working for defendant-employer. Defendants offered no convincing evidence that plaintiff could have obtained a position in Florida earning greater pay than that which he obtained.
23. As of the initial hearing date, plaintiff continued to have pain in his back, hips and lower leg. Based upon plaintiff's testimony, as well as the last physician's evaluations, it appears plaintiff may need additional medical treatment, either through physical therapy or pain clinic to help manage his pain. However, plaintiff has thus far refused such assistance.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. The plaintiff was temporarily totally disabled from his prior job as hydrogenation plant operator at the time he moved to Florida and when the employer offered him the job as Filling and Packaging Clerk. The job offered to plaintiff as a Filling and Packaging Clerk was not a legitimate job but was "make-work". Therefore it does not establish that plaintiff was capable of obtaining a position suitable to his age, education, experience and physical capabilities. Bridges v. Linn — CorriherCorporation, 90 N.C. App. 397 (1988) cert. denied323 N.C. 171 (1988); Peoples v. Cone Mills, 316 N.C. 426
(1986).
2. At the time plaintiff moved to Florida and subsequently when the Form 24 was approved, plaintiff was capable of performing light to medium work. However, no such work was available with the defendant-employer. Defendants presented no evidence that there were other jobs available in the job market compatible with plaintiff's restrictions which plaintiff could actually obtain. Therefore, the Form 24 should not have been approved. Radica v.Carolina Mills, 113 N.C. App. 440 (1994).
3. Plaintiff is entitled to temporary total disability benefits at the rate of $324.02 per week, from the date payment was stopped under the approved Form 24, on or about July 7, 1994 until the date plaintiff returned to work in Florida for the car wash on or about October 7, 1994. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to temporary partial disability benefits at the rate of sixty-six and two-thirds percent of the difference between his average weekly wage of $486 and his new weekly wages, as determined by actual weekly wages earned, beginning on or about October 7, 1994, not to exceed 300 weeks from the date of the injury by accident, May 4, 1993. N.C. Gen. Stat. § 97-30.
5. Plaintiff has reached maximum medical improvement, and it does not appear that further assessment of his condition is necessary. However, he is entitled to continuing medical treatment, such as physical therapy, so long as reasonably necessary to help give relief from his pain. N.C. Gen. Stat. § 97-25.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $324.02 per week from the date temporary benefits were previously stopped pursuant to the Form 24, on or about July 7, 1994 until plaintiff returned to work on or about October 7, 1994.
2. Defendants shall pay plaintiff temporary partial disability benefits at the rate of sixty-six and two-thirds percent of the difference between $486.00 per week and plaintiff's actual new weekly wages, beginning on or about October 7, 1994 and continuing until the maximum of 300 weeks from the date of plaintiff's injury by accident, or until further order of the Commission. Should the parties disagree on the proper sum for any of these weekly periods, the matter should be brought to the attention of the Commission for proper disposition of any dispute.
3. Defendants shall pay for medical treatment from a designated physician within a reasonable distance of plaintiff's Florida residence, so long as such treatment is causally related to plaintiff's injury by accident and is reasonably necessary to give plaintiff ongoing relief from his pain.
4. An attorney's fee of twenty-five percent of the compensation awarded plaintiff is approved for plaintiff's counsel. One fourth of the compensation accrued to date and due plaintiff shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check due plaintiff shall be forwarded directly to plaintiff's counsel.
5. Defendants shall pay the costs.
IT IS ORDERED that this matter be removed from the Full Commission hearing docket.
FOR THE FULL COMMISSION
 S/ __________________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _______________________ THOMAS J. BOLCH COMMISSIONER
S/ _______________________ DIANNE C. SELLERS COMMISSIONER
JHB/mj 8/28/96